SIOUX COUNTY (GROSS v.). See Case No. 5,842.

## Case No. 12,910.
### The SIREN.
[9 Ben. 194.] [1]
District Court, E. D. New York. July, 1877.

ADMIRALTY—COSTS—FINAL RECORD—NOTICE OF TRIAL.

Fees in an admiralty suit for various services performed by the clerk, considered.

[1] [Reported by Robert D. Benedict. Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

In admiralty.

J. J. Allen. for libellant.
Huntley & Adams. for claimant.

PRIZE—CAPTORS—ACT OF CONGRESS—ABANDONED VESSEL—SALVAGE.

1. The prize act of 1864 [13 Stat. 306]. does not exhaust the subject of prize or no prize. There may still be captures which go to the United States only and not to the captors, and there may be prize without captors.

2. On the day that Charleston surrendered to our joint forces. but after the surrender. a commissioned cruiser found and took possession of an abandoned merchant vessel, and saved her from imminent loss by fire. Held, that neither that cruiser nor the fleet generally. were captors, but that the vessel was prize to the United States.

3. The surrender of Charleston operated the capture of all the prize or booty in the town and harbor.

4. Salvage was decreed to the finders of the prize. for putting out the fire.

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]
[2] [Affirmed in 13 Wall. (80 U. S.) 389.]

On the 18th of February, 1865. at noon after Charleston had surrendered to the United States forces, the Gladiolus, a steam-tug commissioned as part of our fleet. discovered the Siren, which was a blockade-runner, on fire in the Ashley river, about one hundred yards below the first bridge. She was unarmed, had been abandoned, and set on fire, and her pipes cut. At the same time that the boat from the Gladiolus came near the prize, a boat from the Commodore McDonough, another naval vessel. undertook to board her, but turned back on finding that the Gladiolus was nearer. The whole fleet was then under way. moving up the harbor, and many vessels were within signal distance of the prize at the time of the capture. About ten or a dozen colored men, civilians, in Charleston. assisted with buckets in putting out the fire.

C. Cowley, Lothrop & Bishop, C. W. Tuttle, S. B. Allen, J. P. Woodbury, and C. L. Woodbury, for the several vessels of the fleet.

R. H. Dana, Jr., Dist. Atty., submitted the case without argument.

LOWELL, District Judge. The rebel army evacuated the forts in the harbor of Charleston and the town itself, on the night of February 17, 1865, and on the next morning our fleet and army took possession. Who first raised the flag of the United States within the town, and at what precise time, does not distinctly appear in evidence; but whatever was done was by consent of the citizens, represented by their municipal officers, though certainly that consent was not very important in a military point of view. At about eleven o'clock in the forenoon the steam-tug Gladiolus, a commissioned vessel of the navy, was proceeding up the harbor, and her officers were informed that a steamer was lying near one of the bridges abandoned; they went to her at once and found the blockade-runner, Siren, on fire, with her steam pipes cut, so that she was in great danger of instant destruction. A boat from the Commodore McDonough, another naval vessel, had been making for the Siren, but turned back on learning that the steam-tug was bound on the same errand and would arrive sooner. The officers and crew of the tug put out the fire and turned the Siren down the harbor towards the fleet, where, with the aid of some persons from other cruisers, the vessel was kept afloat, and so far repaired as to be navigable. The Siren has been condemned as prize and sold, and the questions left for decision relate to the distribution of the proceeds.

The prize act of 1864, c. 174 (13 Stat. 306), treats the subject chiefly as it concerns naval captors, and does not profess to deal with the subject of prize generally and fully. It cannot be doubted that there may be a seizing or taking jure belli of enemy property within the ebb and flow of the tide which is neither by public nor private arm-ed ships, as, for instance, by a direct surrender to civil officers, &c. The celebrated order in council in England, passed March 6. 1665–66, reported, among other places, in Hay & M. 50, which declares the rights of the lord high admiral, mentions many instances of prize which are droits of the admiralty, such as "enemy's ships and goods casually met at sea and seized by any vessel not commissioned." &c. Now, in England, during the colonial period, these several droits of the admiralty were not prize to the captors, because the king's several grants to the takers of prizes were made in each war as the occasion arose, and were subsequent in date to the general grant to the lord high admiral. So that the English cases are very numerous in which prizes are condemned. to the admiral, or, in later times, to the king in his office of lord high admiral, and not to the captors. It may well be conceded that the United States have succeeded to the rights in prize, both of the crown and of the lord high admiral, and that congress has the right to grant prize-money to whomsoever it pleases, without regard to these ancient distinctions. Still, in construing the prize acts, it is useful to recollect that by the English law the grants of prize-money had their well understood limitations, and that a condemnation in prize was not necessarily a condemnation to captors; and that there were prizes which were not granted to either the admiral or the captors, such as vessels voluntarily brought in on revolt by their own crews, and vessels seized in port before declaration of hostilities; so that there were three different kinds of condemnation,—to the king, to the admiral, and to the captors. I have no doubt that some of the same distinctions and limitations hold good in this country to-day. Whatever is prize of war by international law in the several countries which acknowledge that law, is so here, and our prize acts do not undertake to limit or define the boundaries of prize or of prize jurisdiction. Accordingly, I have held, in a case of cotton picked up at sea, that it was properly proceeded against as prize, and I have no doubt of the propriety of that decision. Seventy-Eight Bales of Cotton [Case No. 12,679]. It necessarily follows that there may be prize when there is no one who is a captor under the prize act. Thus, if a person or a vessel having no existing commission makes a prize, the condemnation goes to the United States. The Dos Hermanos, 10 Wheat. [23 U. S.] 306. So if there be no captor at all, as of vessels voluntarily brought into port by their crews, or driven in by stress of weather. The old grant of droits of the admiralty was of prizes of this character, but it did not include all of this kind; the distinction, therefore. is older than the grant of droits, and the principle remains good in our law, that there may be seizers or takers in a certain sense who are not entitled to prize-money

as technical captors, though the goods seized may be prize.

Upon the best consideration I have been able to give the subject, my opinion is that the Gladiolus was not the captor of this prize within the true intent of our statute, nor was the fleet as a whole.

All seizures of this character are made for the benefit of the government, in the first instance, and are under its control, and the captors have no vested rights until after a decree has been rendered, even if they have any before actual distribution made. This is a well-settled doctrine in prize law, and is necessary to the freedom of action of the government in its dealings with neutral nations. One consequence of this general rule is that grants of prize money are to be construed strictly, and the burden is on the grantee to bring his case within the grant. Our prize act is the grant; for, though not exhaustive of the subject of prize or no prize, it is exhaustive of the subject of distribution. The prize act relates to captures by commissioned vessels. It does not in terms deal with captures by the army and navy jointly, nor with several other classes of entirely legitimate takings. The law of England was established by a decision of the lords of appeal, as long ago as 1785, that capture by conjoint expeditions of land and sea forces were not distributable in the admiralty to the naval part of the captors, and, therefore, not distributable at all (The Hoogskarpel, cited 2 Dods. 446); and the former practice of giving a proportion to the navy, upon some notion of an equitable division, was declared to be unsound.

This matter was soon afterwards and is still regulated by acts of parliament, but those acts do not set aside the principle of the decision, but provide with care for the proper distribution of the prize-money to the army and navy in a manner calculated to do justice to both, and not merely to the navy alone. The principle on which the original decision was made is applicable to this case. Here a fortified town, besieged by land and sea, is evacuated by the enemy, and surrendered by the civil authorities. The evacuation may be presumed to be caused by the pressure of both the naval and the military forces. If the fact were carefully examined, it might appear that the reasons for the abandonment were rather military than naval, but that is not important. It is fair to assume that they were both.

Now, in equity, the capture of all the property thus abandoned and surrendered must be credited to both army and navy; but as this court has not been invested with power to deal with such captures in the way of distribution, the remedy must be sought from congress. It is said that there were several war vessels of the rebels in the harbor, which were found and sent home, and which the navy department at first declared its intention of bringing before a prize court, but that this purpose was abandoned, and the vessels have been taken by the government without any adjudication. This seems to show that the department considered that a different course was proper to be pursued with vessels of war and mere merchant ships, or else that after the Siren was sent in, it reconsidered its action, and assumed that the court would necessarily condemn for the benefit of the United States only. If the latter was the view, I consider the principle to be sound, though the practice may be of doubtful propriety. If either an international question or one of salvage could arise, it would have been not only fitting, but necessary for the due ordering of the matter and its final adjustment, that a prize court should pass upon it. But the assumption was right that the property which, whether afloat or on shore, was liable to seizure, and was in fact abandoned and surrendered, was in law captured at the moment of the capture or surrender of the town, and that the chance finder of such property within the abandoned lines, whether a commissioned officer or not, and whether belonging to one or the other service, was bound to seize for the government, and not for himself. The argument was pressed with much force, that all the fleet must share in such a prize as this, because there was no actual chase or capture by the Gladiolus, but a virtual taking by the whole. I admit the argument, but give it a wider application, and say there was a virtual surrender to the United States forces generally, and the army as well as the fleet are captors. If a file of soldiers had happened to go on board first, the right of the fleet would have been no greater or less than it now is. But, as the prize act does not meet such a case, I am obliged to say that the remedy must be sought elsewhere. It is undoubtedly true, that if the navy had not been present, this prize might have escaped to sea; but if the army had not been present the town might not have been surrendered when it was surrendered, and if not, the capture might equally have failed.

In the case of the cotton found floating at sea, I not only condemned the proceeds as prize, but as prize to the captors. This I did on the ground that we have applied the principle of droits of the admiralty only so far as reason and justice require, and that the grant of our prize act may well extend to any taking at sea by a commissioned cruiser, whether there be any resistance or not. The point argued in that case was, whether the goods were prize at all, or were derelict. I had no doubt they were both. Whether they were prize to the captor was not argued independently of the main question of prize or no prize, and I did not think it very important, because, under the circumstances of that case, I should probably have had no difficulty in giving as salvage the moiety

which the act grants as prize-money, and so it was merely a question of the form of the decree. But the distinction between that case and this is, that there the taking was clearly and only effected by the commissioned cruiser, and there was no evidence how, when, or why the goods had been abandoned, but only that they were enemies' property, while here we know or must presume that the abandonment was caused by the presence of the joint forces, and the capture may fairly be said to have been complete before the tug came up. If a commissioned ship had come into the port that night and found one of these abandoned vessels in a corner of the harbor out of signal distance of any of the fleet, it would shock our sense of justice to say that the prize should be condemned to that vessel as sole captor; but the only grounds on which the fleet can claim here are either that the tug was sole captor by virtue of such a casual finding, and that the others were in signal distance, or else that there was a constructive capture by the whole fleet. If a constructive capture, it was by army and fleet. We cannot resort to constructive capture to let in the whole fleet, and to actual capture at the same time to shut out the army.

The Gladiolus herself stands differently. By the elastic practice in prize, a vessel failing in a demand for prize-money may be admitted to receive salvage. Theoretically this reward is given for the preservation and care of the property, and not for its capture, though, in fact, in most cases, the meritorious service is chiefly in the capture. But in the present case there were services of a strictly salvage character, by which the prize was saved from imminent danger of great damage or destruction.

But as this point has not been argued, and as there may be questions upon which the several parties may desire to be heard, not only as to quantum, but even the general question of whether these naval persons can be salvors, in such a case, I will hear counsel upon this at an early day, if requested.

At a subsequent day the court awarded salvage to the Gladiolus.

[NOTE. The court allowed the claim for salvage, and ordered that the residue of the fund, less the sums decreed for damages arising from a collision referred to below, should be paid over to the United States. An appeal was then taken to the supreme court, where the decree of the district court was affirmed. 13 Wall. (80 U. S.) 389.

The Gladiolus, while on her way to Boston for adjudication, collided with and sank the sloop Harper while off Long Island Sound. Upon the arrival of the steamer at Boston, she was condemned as prize and sold. Pending these proceedings the owners of the Harper intervened by petition, claiming damages out of the proceeds. The district court held that the intervention could not be allowed, and dismissed the petition. Case unreported. Upon an appeal by claimants to the supreme court, damages were allowed. 7 Wall. (74 U. S.) 152.]